**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **NO. 1:19-cr-0017 (DLF)** |
| | : | |
| **v.** | : | |
| | : | |
| **BRIAN JAMES LAPRATH,** | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case.  For the reasons set forth herein, the government recommends that the Court sentence the defendant to 18 months of incarceration.  The government further recommends that the Court sentence the defendant to 3 years of supervised release with conditions including that the defendant undergo sex offender treatment (as recommended by the United States Office of Probation), the defendant's computer and internet usage be limited and monitored, and the defendant's direct contact with minors be limited and supervised.

## I.    BACKGROUND

On January 31, 2019, the defendant pled guilty to one count of Laundering of Monetary Instruments, in violation of 18 U.S.C. § 1956(a)(2)(A).  During the plea hearing, the defendant admitted the following facts, as set forth in the written Statement of Offense, to be true.

### A.    The Website

Beginning in September 2017, law enforcement initiated a large scale investigation into a Tor based child pornography website, hereinafter referred to as "The Website."[1]  Tor is a computer

---

[1]    The actual name of "The Website" is known to law enforcement.  The disclosure of the name of The Website would potentially alert its users to the fact that law enforcement action is being taken against users of The Website, thereby provoking users to notify other users of law

network designed to facilitate anonymous communication over the Internet.  The Tor network does this by routing a user's communications through a globally distributed network of relay computers, or proxies, rendering conventional Internet Protocol ("IP") address-based methods of identifying users ineffective.  To access the Tor network, a user must install Tor software either by downloading an add-on to the user's web browser or by downloading the free "Tor browser bundle." When a Tor user accesses a website, only the IP address of the last relay computer (the "exit node"), as opposed to the user's actual IP address, appears on the website's IP address log.  Currently, there is no practical method to trace a user's actual IP address back through those Tor relay computers.  The Tor Network also makes it possible for users to operate websites, called "hidden services," in a manner that conceals the true IP address of the computer hosting the website.

The Website operated as a hidden service on the Tor network until March of 2018.   The Website was used to host and distribute video files depicting child pornography that could be downloaded by site users. In fact, the upload page on The Website clearly states: "Do not upload adult porn."  Any user could create a free account on The Website by creating a username and password.  Only after the user registered an account could the user browse previews of videos available for download and post text to The Website.  To download videos from the site, users must use "points," which are allocated to users by The Website.  A registered user could earn points from The Website in several ways: (1) uploading videos depicting the sexual exploitation of children; (2) referring new users to The Website; (3) paying for a "VIP" account, which lasted for six months, entitled a user to unlimited downloads, and was priced at 0.03 Bitcoin (approximately $327.60 USD

_____

enforcement action, flee, and/or destroy evidence.  Accordingly, to protect the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the website will be identified herein as "The Website."

as of March 1, 2018); or (4) paying for points incrementally.[2]

As of February 8, 2018, The Website had over 125,000 unique videos available for downloading.  In order to prevent duplicate videos from being uploaded, The Website provided a digital hash-value check in order for the user to compare his or her video to other videos previously uploaded to the site.  The Website did not allow a user to upload a video whose hash value matched something previously uploaded to the site.  According to law enforcement's viewing of The Website as of February 8, 2018, the videos stored on The Website amounted to over seven terabytes of data.  As of February 8, 2018, The Website indicated on its download page details that its users had downloaded files from The Website more than one million times.

**B.      Defendant's Laundering of BTC to Promote Specified Unlawful Activity**

Law enforcement identified the defendant's BTC account number, created on June 28, 2016 at a BTC exchange ("BTC Exchange").  In order to comply with due diligence obligations imposed by the BTC Exchange, the defendant provided his social security number, home address, phone number, driver's license number, and date of birth when opening his BTC Exchange account.  The defendant linked his BTC Exchange account to two USAA Federal Savings bank debit cards in his name.  On or about June 29, 2016, the defendant funded his BTC Exchange account via two transfers from his USAA Federal Savings account.  Within a few minutes, the defendant sent a total of .06

---

[2]      Bitcoin ("BTC") is a type of virtual currency, circulated over the internet.  BTC are not issued by any government, bank, or company, but rather are controlled through computer software operating via a decentralized, peer-to-peer network.  BTC is just one of many varieties of virtual currency.  To acquire BTC, a typical user purchases them from a BTC virtual currency exchange.  A virtual currency exchange is a business that allows customers to trade virtual currencies for other forms of value, such as conventional fiat money (e.g., U.S. dollars, Russian rubles, euros).  Exchanges can be brick-and-mortar businesses (exchanging traditional payment methods and virtual currencies) or online businesses (exchanging electronically transferred money and virtual currencies).  Virtual currency exchanges doing business in the United States are regulated under the Bank Secrecy Act and must collect identifying information about their customers and verify their clients' identities.  It was through this "know your customer" policy that law enforcement were able to identify the defendant's BTC account number associated with payments to The Website.

BTC, via two transfers, to a wallet associated with The Website.  The defendant only used his BTC Exchange account to fund his account at The Website.

Law enforcement's review of the forensic image of the electronic storage devices that had hosted The Website revealed that the defendant downloaded at least five videos from The Website. Examples of the video downloaded from The Website include, "Blogtv Smotri-2010-Glamour (12Yo Super Cute Girl Masturbate) Blackdress-Webcam.avi" with a description on The Website of "Cute WebcamGirl," and "mf16holland_omegle.mp4" with a description on The Website of "full sex omegle 13 years."

### C.     Defendant's Statements

On August 9 2018, law enforcement conducted a non-custodial interview of the defendant. The defendant admitted to viewing child exploitation materials on the dark net via TOR, including on The Website, and the clear net since he was 12 years old.  The defendant explained that he would use a Virtual Private Network service to anonymize accessing such sites.  The defendant, who serves in the Air Force, stated that he accessed child exploitation materials while deployed with the Air Force the same way he does when he is at home.  The defendant stated the last time he saw child exploitation materials was hours before the interview with law enforcement.

The defendant stated that he never retained any files; rather, he would download the videos and "shred it" afterwards, which he stated meant to securely erase the files.  The defendant further explained that he never saved any such files for more than a few hours.

The defendant stated he sought counseling approximately two years ago from his pastor and from a trained medical professional. The defendant explained that he reached out for assistance because he knew that it was wrong to view child pornography.

## II.      SENTENCING CALCULATION

### A.      Statutory Penalties

The charge of Laundering of Monetary Instruments, in violation 18 U.S.C. § 1956(a)(2)(A), carries a maximum sentence of 20 years imprisonment, a fine of not more than $500,000, or a fine of twice the value of the property involved in the transaction, pursuant to 18 U.S.C. § 1956(a)(1), and a term of supervised release of not more than three years, pursuant to 18 U.S.C. § 3583(b)(2).

### B.      Guidelines Range

The Presentence Investigation Report ("PSR") sets forth the correct calculation of the defendant's Guidelines range.  The Guideline for Count One, Laundering of Monetary Instruments, is U.S.S.G. § 2S1.1

The base offense level for Laundering of Monetary Instruments is 8.  PSR ¶ 16.  The following Specific Offense Characteristics apply: (a) a six level increase because the defendant knew or believed the laundered funds were intended to promote an offense involving the sexual exploitation of a minor; (b) a two level increase because the defendant was convicted under 18 U.S.C. § 1956; and (c) a two level increase because the offense involved sophisticated laundering. PSR ¶¶ 17-19.  Accordingly, the base offense level is 18. PSR ¶ 23.

The defendant is entitled to a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a).  PSR ¶ 25.  The government hereby moves to decrease the defendant's offense level by an additional level pursuant to § 3E1.1(b) because he timely notified the authorities of his intention to enter a guilty plea and thus permitted the government and the Court to preserve resources.  PSR ¶ 26.  As a result, as set forth in the plea agreement, the defendant's total offense level is 15.  PSR ¶ 27.

The defendant has no prior criminal conviction.  PSR ¶ 29.  Accordingly, the defendant has

zero criminal history points and is a Criminal History Category I. PSR ¶ 30. With a total offense level of 15 and a Criminal History Category of I, the defendant's sentencing range of imprisonment is 18 to 24 months of incarceration. PSR ¶ 85.

## III.    GOVERNMENT'S RECOMMENDATION

### A.    Application of the Federal Sentencing Guidelines

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that themandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). Booker, 125 S. Ct. at 756.

In post-Booker cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. See United States v. Gall, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). Id. These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to

avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

Notably, the United States Sentencing Commission conducted a hearing on the child pornography sentencing guidelines on February 15, 2012.  Department of Justice (DOJ) employees James Fottrell and Steve DeBrota, and former DOJ employee Francey Hakes provided the following testimony regarding how technological advances were exacerbating the threats posed by child pornography offenses:

> In the last ten years, we have seen a sharp increase in the severity and depravity of child pornography offenses, fueled in large part by *swiftly advancing technological changes* which permit offenders to easily store large numbers of images of child sexual abuse, to create safe havens online where they can communicate and bond with other individuals who encourage and promote the sexual exploitation of children, and to utilize sophisticated methods to evade detection by law enforcement.  This increase is reflected in the changes in the content of the images over time, as infants and toddlers are now regularly victimized by child pornography offenders and the victims are forced into more brutal and degrading sexual activity.
>
> Additionally, *the technological changes that continue to make it easier for offenders to commit these crimes* are reflected in the number of defendants prosecuted in federal court for child pornography offenses, which has increased every year for over ten years.
>
> We are also seeing the crime change with respect to the *technical complexity and sophistication of the offenders who exploit the developments in both software and hardware*.  Storage capacity on hard drives and external media has exploded at the same time that prices for such equipment have dropped, making it feasible for individuals cheaply to store millions of image and video files. Internet speeds have skyrocketed, allowing users to download a video in a matter of seconds that, just a few years ago, would have taken hours. At the same time, smart phones and the development of faster wireless networks have turned phones into a viable and portable alternative method to distribute and collect child pornography. *New platforms are being constantly developed to allow individuals to chat, network, and share files. Child pornography offenders are early adopters of these platforms, co-opting them to further their criminal purpose and to create virtual communities that exist outside the bounds of normal society and that embrace and promote the sexual exploitation of children*. Finally, offenders are *exploiting the development of new technologies*, such as evidence eliminating software, encryption, and methods to conceal their Internet activities, *to evade detection by law enforcement*. The result of these changes is clear: we are seeing more and more offenders, engaged in more

7

sophisticated criminal conduct, exploiting a larger number of children in a more depraved way.

See        https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Hakes_DeBrota_Fottrell.pdf (emphasis added).

Moreover, on November 13, 2013, Acting Assistant Attorney General Mythili Raman testified before the Senate Committee on Homeland Security and Governmental Affairs provided the following testimony regarding the unique threat posed by cryptocurrency, including as to child pornography offenses:

As virtual currency has grown, it has attracted illicit users along with legitimate ones. Our experience has shown that some criminals have exploited virtual currency systems because of the ability of those systems to conduct transfers quickly, securely, and often with a perceived higher level of anonymity than that afforded by traditional financial services. The irreversibility of many virtual currency transactions additionally appeals to a variety of individuals seeking to engage in illicit activity, as does their ability to send funds cross-border.

Cyber criminals were among the first illicit groups to take widespread advantage of virtual currency. We have seen that many players in the cyber underground rely on virtual currency to conduct financial transactions. *Early users of virtual currency also included criminals involved in the trafficking of child pornography*, credit card fraud, identity theft, and high-yield investment schemes. As virtual currency became more widespread and criminals became increasingly computer savvy, other criminal groups moved to capitalize on virtual currency, as well. There are now public examples of virtual currency being used by nearly every type of criminal imaginable.

It is not surprising that criminals are drawn to services that allow users to conduct financial transactions while remaining largely anonymous. And, indeed, *some of the criminal activity occurs through online black markets, many of which operate as Tor hidden services.* Tor hidden services are sites accessible only through Tor, an anonymizing network that masks users' Internet traffic by routing it through a series of volunteer servers, called "nodes," across the globe. *Online black markets capitalize on Tor's anonymizing features to offer a wide selection of illicit goods and services, ranging from pornographic images of children* to dangerous narcotics to stolen credit card information.

See https://www.justice.gov/opa/speech/acting-assistant-attorney-general-mythili-raman-testifies-senate-committee-homeland (emphasis added).

B.     **Basis for the Government's Recommendation**

The government submits that the sentence of 18 months of incarceration is appropriate and warranted in this case and specifically recommends a period of supervised release of 3 years based on the factors in 18 U.S.C. § 3553(a).  The recommended sentence is sufficient, but not greater than necessary, to accomplish the purposes of sentencing.

1.     Nature and Circumstances of the Offense

As set forth above, the defendant laundered funds in a sophisticate manner to support a prolific child pornography website.  Consistent with the Justice Department testimony noted above, the defendant's use of cryptocurrency and technologically-advanced online black markets made tracking his activities exponentially more difficult to discover by law enforcement and demonstrate the growing threat posed by such technology in the child exploitation realm.

While the defendant was not "involved in taking photographs of children, his conduct had allowed the child pornography enterprise to continue," United States v. Grebenschikov, 288 F. App'x 834, 837 (3d Cir. 2008).  The Website grew incrementally from the funds it received.  The growth of The Website was not limited to the monetary value the defendant paid into the site.  For example, the defendant's downloading of videos rewarded the uploaders of those videos with more points, with which they could download more videos.  Moreover, the defendant participated in the feeding of a demand for such content, which was measured by the number of clicks; where such demand existed, a supply was manufactured, viz., more children being exploited.  See Paroline v. United States, 134 S. Ct. 1710, 1741 (2014) (citations omitted) ("By communally browsing and downloading Internet child pornography, offenders like Paroline 'fuel the process' that allows the industry to flourish . . . .  Indeed, one expert describes Internet child pornography networks as "an example of a complex criminal conspiracy . . . ").  Thus, the defendant's conviction for money laundering to promote child exploitation necessarily requires a consideration of the harms posed

by child exploitation offenses.

Examples of the video descriptions the defendant downloaded from The Website shows an individual with a specific interest in viewing the sexual abuse of pre-pubescent children (for example, "9y babe geting fuck in the pussy," "Girl 10yo fun and the end suck dad," and "5yo playing her vagina with her mom licking and masturbating."). It goes without saying that child pornography causes real and lasting harm in our society. It is not just about images and videos; it is about real children who are at best being treated as sexualized objects and at worst being horrifically and repeatedly sexually abused. Individuals—like the defendant—who promote child pornography offenses are part of the illicit market for child pornography, which continually re-victimizes the children in already-existing images and videos. As the Supreme Court recognized in the seminal case of New York v. Ferber:

> The use of children as subjects of pornographic materials is very harmful to both the children and the society as a whole. It has been found that sexually exploited children are unable to develop healthy relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults.
>
> Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place.

458 U.S. 747, 758-60 nn. 9 & 10 (1982). The Court continued, "[a] child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography . . . . It is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotion repercussions." Id. at 759 n.10. Victims must cope, every day, with wondering whether someone they have come in contact with has seen the pictures or videos of their abuse.

2.      History and Characteristics of the Defendant

In most criminal cases, a defendant will appear for sentencing and offer mitigating evidence, asking the Court to consider the defendant's sometimes less obvious, but positive attributes.   In child-exploitation related crimes, however, a defendant's good qualities are frequently the easiest to see.   Defendants appear to be like any other law-abiding citizen—they work, worship, and have the support of their families.   Their crimes against children, and the reasons they commit them, have been hidden from colleagues, friends, and loved ones.   Despite that fact, the perpetrator's private crime is a horrific one, and offenders must be held accountable for the damage they have done.

3.      Punishment, Deterrence, Protection, and Correction

A sentencing court "shall impose a sentence sufficient, but not greater than necessary" to comply with the need for a sentence: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).

The government's recommended sentence is sufficient, but not greater than necessary, to provide just punishment for the defendant's offenses.  The defendant's laundering of funds via sophisticated methods to promoted a child exploitation scheme harmed society at large and specifically, child victims, and thus warrants a sentence of imprisonment.  Moreover, a term of supervised release with conditions including sex offender assessment and treatment is important to ensuring that the defendant receives the continuing treatment and support that will ensure he does not commit any additional crimes in the future.

4.     Available Sentences And Supervised Release Conditions

The defendant should be sentenced to a term of incarceration.  The defendant is in Zone D of the Guidelines, and thus a probationary sentence would be a departure from the Guidelines. PSR ¶ 97.  According to the PSR, the defendant does not have the ability to pay a fine in this case. PSR ¶ 83.

In addition, the Court should impose a term of supervised release, and the government recommends a term of 3 years.  Supervised release is critical because it will subject the defendant to ongoing monitoring and ensure that he does not revert back to his criminal conduct when he finds himself facing a life challenge or obstacle.

The conditions of supervised release should include the following conditions, which are conditions imposed in similar child exploitation cases and conditions:

(1) The defendant must submit to searches of his person, property, house, residence, vehicle, papers, computers, other electronic communications or data storage devices or media, and effects, at any time, with or without a warrant, by law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of supervision.

(2) The defendant must undergo and comply with sex offender evaluation and treatment. This may include the use of polygraph testing as part of the therapeutic process.

(3) The defendant's use of the Internet, computers, and any other Internet-capable devices will be restricted and monitored.

(4) The defendant will not have direct contact with minors without the written approval of probation.  This also entails both an employment/volunteer restriction and residential restriction, in that the defendant shall not be employed in any capacity, or participate in any volunteer activity, which may cause him to come in direct and/or unsupervised

contact with children for more than momentary duration without advanced approval by the United States Probation Office, and the defendant shall have all residences pre-approved by the United States Probation Office.  Specifically, the defendant shall not live in a residence where minor children also reside without the permission of the United States Probation Office.

Although the defendant will not be required to register as a sex offender, his crimes stem from his online activities and warrants monitoring of his electronic devices and Internet activities. Moreover, the defendant's long-standing interest, by his own admission, in the exploitation of children justifies monitoring his direct contact with any minors and supports the imposition of sex offender evaluation and treatment.

5.      <u>Avoiding Unwarranted Sentencing Disparity</u>

One of the statutory factors to consider at sentencing is the need to avoid unwarranted disparity.  Indeed, avoiding such uncertainty and disparity was one of the purposes for the creation of the Sentencing Guidelines.  No similarly situated defendants have been sentenced in this matter. This Court sentenced the only other customer of The Website to a much longer sentence of imprisonment; however, that defendant pled guilty to additional charges and had a related criminal history, which triggered certain mandatory minimums.

It is without dispute that the defendant indicated early on that he accepted responsibility and wished to plead guilty.  He acknowledged his criminal responsibility and sought counseling after his illegal conduct came to light.  <u>PSR</u> ¶ 50.

Accordingly, the government's recommendation, at the low end of a guideline sentence, is appropriate based on the factors presented in this case.

6.     <u>Restitution and Victim Impact Statements for the Victims</u>

The National Center for Missing and Exploited Children reviewed the videos downloaded by the defendant from The Website.  There were no identifiable victims in these videos.  Accordingly, there is no restitution or Victim Impact Statements available for these unidentified child victims.

IV.    **CONCLUSION**

WHEREFORE, for all of the reasons set forth herein, the government recommends that the Court sentence the defendant to a term of imprisonment of 18 months, to be followed by 3 years of supervised release, with the recommended conditions of supervision.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY

___/s/_____
Zia Faruqui, D.C. Bar 494990
Lindsay Jill Suttenberg, D.C. Bar 978513
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7117; Zia.Faruqui@usdoj.gov
(202) 252-7017; Lindsay.Suttenberg@usdoj.gov